Gilbert RIVERA, Petitioner,

v.

James CONWAY, Superintendent, Attica Correctional Facility, Respondent.

No. 04 Civ. 347(DC).

United States District Court, S.D. New York.

Dec. 28, 2004.

Gilbert Rivera, Attica Correctional Facility, Attica, NY, for Petitioner Pro Se.

Robert Morgenthau, Esq., District Attorney for New York County by Susan Gliner, Esq., Assistant District Attorney, New York, NY, for Respondent.

### OPINION

CHIN, District Judge.

*Pro se* petitioner Gilbert Rivera brings this petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner was convicted on July 19, 1996, after a jury trial in the Supreme Court of the State of New York, New York County, of murder in the second degree. He was sentenced on September 10, 1996 to a term of imprisonment of 25 years to life.

Petitioner contests his conviction on the following grounds: (1) the trial court gave an erroneous jury instruction regarding the hearsay statements of an unavailable witness, (2) appellate counsel was ineffective, and (3) trial counsel was ineffective. The Court has reviewed the parties' submissions and the record of the proceedings below. For the reasons that follow, the petition is denied.

### BACKGROUND

**I. The Facts**

The following is a summary of facts adduced at Rivera's trial.[1]

On April 7, 1987, Rivera shot and killed Nick Denoia at the behest of Augustine Colon, who was acting on behalf of Steve Banerjey. (Tr. 1108, 1134).[2] Banerjey and Denoia had become partners in "Chippendale's," a male exotic dance club, in the early 1980s, and the shooting was the culmination of years of feuding between them. (Tr. 553, 559–61, 564–68).

In 1986, Banerjey asked Colon to kill Denoia. (Tr. 1096). Colon was a former Chippendale's employee who had performed a variety of jobs for Banerjey, including the attempted arson of competing clubs. (Tr. 1057, 1341, 1062). Colon initially refused to agree to kill Denoia, but Banerjey offered him $25,000 and forgiveness of a $7,000 debt, and threatened him with physical harm. (Tr. 1104–05, 1108, 1097). Colon in turn recruited Rivera and the two traveled to New York to kill Denoia in April, 1987. (Tr. 1108, 1111).

About 3 P.M. on April 7, 1987, Colon drove Rivera to Denoia's Manhattan office building. (Tr. 278). Once inside, Rivera encountered Denoia's co-worker, William Mott, who gave him directions to Denoia's office. (Tr. 292). A few minutes later, Mott heard a loud cracking noise and rushed to the office to find Denoia dead with a gunshot wound in his left cheek. (Tr. 295).

In 1991, in the course of investigating an unrelated case, FBI Special Agent Andrew Stefanak met and interviewed Colon, who implicated Rivera in the Denoia murder. (Tr. 621). Colon agreed to cooperate. (Tr. 621, 1587).

At the instruction of the FBI, Colon attempted to contact Rivera in 1992. (Tr. 679–84, 751). The agents provided Colon with a cover story designed to elicit incriminating statements from Rivera. (Resp.'s Mem. at 33; Tr. 752–54). Colon eventually located Rivera, who was in prison in California on an unrelated matter. Colon proceeded to communicate with Rivera under the pretense that he wanted to hire Rivera to kill a witness to the Denoia murder. (Tr. 750–53, 1246). From June

---

1. This case has a voluminous record, including more than 2,500 pages of trial transcripts and approximately 800 pages of supporting documents from both parties.

2. References to "Tr." are to pages of the trial transcript.

1992 through December 1992, Colon and Rivera exchanged letters and participated in several telephone calls, with Rivera calling collect from prison. There were also three face-to-face conversations, as Colon visited Rivera in prison. Colon recorded these telephone conversations and face-to-face conversations using equipment provided by the agents. (Tr. 965, 1557). Rivera made additional telephone calls to Colon, which Colon recorded, in March and April 1993. (Tr. 892).

In the third and final prison visit on December 24, 1992, Rivera described to Colon what he saw as he shot Denoia. He said that Denoia "just looked up, he was surprised." He said that when Denoia "saw I meant business, ... his whole expression, his whole face just, just changed ... he got the fear." Rivera then told Colon that "I saw a little red dot on his face and I saw him going down." Rivera explained the "red dot": "Where the bullet went in." (*See* Resp. Mem. at 39–40 (quoting People's Exs. 24A, 24B)). This conversation was recorded by Colon, unbeknownst to Rivera, and played for the jury at trial.

At the end of the conversation, Rivera told Colon that he had to serve only 27 more days in prison and that he was going to be released on January 17, 1993. (Tr. 891). In fact, Rivera was not released in January 1993 as he was taken into custody by immigration authorities. (*Id.*).

In April, 1994, New York City police detective Richard Briecke and retired New York City police detective Michael Geddes interviewed Rivera in connection with the Denoia murder. Rivera was incarcerated in Texas, and Briecke and Geddes traveled to Texas to interview him in prison. (Tr. 1677–78, 1682–84, 1702, 1803). They read

Rivera his *Miranda* rights and he waived his right to counsel. (Tr. 1683–84). Once Rivera discovered that Colon was cooperating with the FBI, he provided agents with both oral and written confessions. (Tr. 1678, 1800, 1802, 1814). He admitted that he had met Colon in 1987 and that he went with Colon to New York to do a job. In great detail, he admitted going with Colon to an office building where, with a gun provided by Colon, he shot Denoia in the face. He admitted running out of the office and down the stairs to the street, where Colon was waiting in a car. He admitted driving back with Colon to a hotel, spending the night, and returning to Los Angeles the next day.[3] He admitted being paid a total of $25,000 by Colon for the murder. (Tr. 1689, 1693–96). At the end of the April 1994 interview, Rivera signed a written confession, which was received in evidence and published to the jury. (Tr. 1693–95).

## II. *Procedural History*

### A. *The Proceedings in the Trial Court*

Rivera was indicted in 1994 in the Supreme Court, New York County, for second-degree murder and first-degree possession of a firearm. Rivera moved to suppress the statements he had given to Detectives Briecke and Geddes, challenging the voluntariness of the statements. Justice Harold Beeler held a hearing on the motion on June 19, 1996. He denied the motion the same day, ruling from the bench. After jury selection, trial commenced on June 26, 1996. At the conclusion of the trial, only the murder count was submitted to the jury. (Tr. 2610). On July 19, 1996, the jury found Rivera guilty

---

**3.** The evidence at trial included records from the hotel indicating that on April 7, 1987, at 8:22 p.m., a telephone call had been made from a room registered to Colon to Rivera's home in Los Angeles. (Resp. Mem. at 20 (citing Tr. 1855–57,64; PXs A, B, C)).

of second-degree murder. On September 10, 1996, Justice Harold Beeler sentenced him to a term of imprisonment of 25 years to life.

During the trial, certain events occurred that are the basis for Rivera's present claims. These matters are summarized as follows:

### 1. *Rosario Material* [4]

Detective John McPherrain testified during trial regarding the murder investigation. (Tr. 449). McPherrain requested the Denoia case folder from the Crime Scenes Unit before the trial; he received the final crime scene report, the lead detective's notes, and one page of his own notes. (Tr. 470–72). McPherrain testified that he thought there should have been additional notes, but could not be certain. (Tr. 467). These materials were never found and hence were not available to be turned over to the defense.[5] (Tr. 467–68). During trial, defense counsel twice moved unsuccessfully for a missing evidence or adverse inference charge. (Tr. 532, 2299–300).

### 2. *The Jury Instruction*

One witness, Ali Akram, was unavailable to testify at trial. (Tr. 1758–60). Akram was an elevator operator in Denoia's office building who saw a man running from the elevator around the time of the murder. (Tr. 1676, 1712). Five weeks after the murder, he picked out another man, David Schrem, from a photo array. (Tr. 1714–15). Akram picked out the same man in a lineup a few months later.[6] (Tr. 1716).

At trial, after the court conducted a hearing to determine the admissibility of the evidence, a detective testified regarding Akram's identification. (Tr. 1621, 1641). The court provided this jury instruction immediately after the detective's testimony and again during its charge-in-chief:

> In this case you're at a real disadvantage in evaluating the accuracy of [Akram's] identification, you may be able to glean or obtain from Detective Geddes' testimony, much of it you cannot. Moreover, due to his absence, Mr. [Akram's] absence, you're not able to consider his credibility here in court; his general intelligence; his demeanor; his capacity for observation; his reasoning and his memory. Therefore, while I have permitted you to hear and consider this testimony; I must caution you that you are to approach it with great caution not only because it's eyewitness testimony, but because, and very importantly, because the witness himself was not available to have his perceptions tested here in court under direct and cross examination.

(Tr. 1758–59; *see also id.* 2630–31).

Defense counsel did not object to this instruction at any time during the trial.

### 3. *Rivera's Testimony*

After the prosecution rested, Rivera took the stand and testified in his own

---

4. The prosecution is required to make available to the defendant any written or recorded statements by a witness who testifies at trial, which relate to the subject matter of the witness's intended testimony. *People v. Rosario*, 9 N.Y.2d 286, 213 N.Y.S.2d 448, 173 N.E.2d 881 (1961).

5. The Police Department informed the prosecution that the unit folders from 1987 had been destroyed in storage by a fire or flood. (Tr. 2290). The prosecution went to the storage location but failed to find the files. (Tr. 2290).

6. Mott independently viewed the same photo array and lineup and also selected Schrem. (Tr. 301, 336, 1714–16, 1745). Unlike Akram, he was able to testify at trial. (Tr. 277–360).

defense. In an effort to explain away the incriminating statements he had made in the conversations recorded by Colon and in his confessions, Rivera testified that, although he had not murdered Denoia, he agreed "to take the fall" for the murder in return for a payment of $250,000. He contended that he had memorized the details of the murder from information (or, in essence, a "script") given to him over time by Colon, and that he had pretended to be a killer who was being lulled by Colon into incriminating himself. The plan was for him to sound so convincing the FBI would believe that he was the murderer when he was not. (Tr.1906–30).

### 4. *Jury Poll*

On July 19, 1996, the jury returned a verdict. The transcript shows the following:

> THE COURT CLERK: ... Has the jury reached a verdict?
>
> THE FORELADY: Yes, we have.
>
> THE COURT CLERK: As to the one count of Murder in the Second Degree, what is your verdict?
>
> THE FORELADY: Guilty.
>
> THE COURT CLERK: Ladies and Gentlemen of the Jury, the Court has recorded your verdict as finding the defendant Gilbert Rivera ... guilty of Murder in the Second Degree, and so say you all?
>
> THE FORELADY: Yes.

(Tr. 2675). At Rivera's attorney's request, the jury was polled. (Tr. 2675–76). The transcript shows that each juror replied affirmatively when asked to confirm the "guilty" verdict, except for three jurors. (Tr. 2676–77). Although the transcript shows that Jurors 8, 9, and 10 were polled as well, no reply is noted for Jurors 8 and 9 and the affirmative reply to the inquiry put to Juror 10 is attributed to the Court Clerk. (Tr. 2677). No one—no prosecu-tor, defense lawyer, or juror—raised any objection or noted any disagreement when the Court Clerk concluded, "[a]nd so say you all." (Tr. 2677). Nor did the trial judge note any problems in the polling of the jury.

### B. *The Appeals*

On November 25, 1997, the Appellate Division, First Department, granted Rivera leave to appeal his conviction. (Resp.Mem., Ex. A). As the basis for appeal, Rivera's appellate counsel claimed error in the trial court's instruction to the jury to exercise caution in evaluating the exculpatory hearsay statement of an unavailable eyewitness. (*Id.*). On March 13, 2001, the First Department deemed this issue unpreserved and unanimously affirmed Rivera's conviction. *People v. Rivera–Lopez*, 281 A.D.2d 233, 721 N.Y.S.2d 769 (1st Dep't 2001). The court also ruled that were it to consider the claim on the merits, it would hold that any error was harmless "in light of the overwhelming evidence of [Rivera's] guilt, which included a detailed confession and audiotapes wherein [Rivera] clearly admitted he was the victim's murderer." (*Id.*).

On July 28, 2001, Rivera's application for leave to appeal to the Court of Appeals was denied. *People v. Rivera–Lopez*, 96 N.Y.2d 906, 730 N.Y.S.2d 804, 756 N.E.2d 92 (2001). On or about February 27, 2002, Rivera filed in the First Department a petition for a writ of error coram nobis, asserting ineffective assistance of appellate counsel for failing, *inter alia*, to raise the ineffective assistance of trial counsel for failing to raise the issue of the "non-unanimous verdict." (Resp.Mem., Ex. D). On December 24, 2002, the First Department affirmed petitioner's conviction in a one-page order without discussing the merits. *People v. Rivera–Lopez*, 300 A.D.2d 1154, 752 N.Y.S.2d 253 (1st Dep't 2002).

On or about April 7, 2003, apparently unaware that his coram nobis petition had been denied, Rivera filed in the First Department what he entitled a "motion to amend" his coram nobis petition. This motion sought to add other grounds for the purported ineffective assistance of trial counsel, which appellate counsel purportedly should have raised but did not. (Resp.Mem., Ex. G). The prosecution opposed the motion, arguing that it was a second coram nobis petition. (Resp.Mem., Ex. H). Neither side has indicated whether the First Department ruled on the April 7, 2003 "motion." (*See* Pet. ¶ 10(a)(5); Resp. Mem. at 6). At some point, Rivera again sought leave to appeal to the Court of Appeals; that application was summarily denied on September 15, 2003. *People v. Rivera–Lopez*, 100 N.Y.2d 624, 767 N.Y.S.2d 407, 799 N.E.2d 630 (2003).

### C. *The Habeas Petition*

Rivera's habeas petition was filed in this Court on January 15, 2004.

### DISCUSSION

### I. *Federal Review of State Convictions*

#### A. *Standard of Review*

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") "placed a new restriction on the power of federal courts to grant writs of habeas corpus to state prisoners." *Williams v. Taylor*, 529 U.S. 362, 399, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). AEDPA sets forth new standards of review that make it more difficult for a habeas petitioner to obtain federal relief from a state conviction. It provides that:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.

28 U.S.C. § 2254(d)(1), (2).

■ The statute has been interpreted to require a petitioner to show not only that clearly established federal law was erroneously or incorrectly applied, but that the application was unreasonable. *See Williams*, 529 U.S. at 411, 120 S.Ct. 1495; *see also Lockyer v. Andrade*, 538 U.S. 63, 64, 123 S.Ct. 1166, 155 L.Ed.2d 144 (2003); *Bell v. Cone*, 535 U.S. 685, 685–86, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002). As the Second Circuit explained, "a state court decision is 'contrary to' Supreme Court precedent only if it either 'arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law' or 'confronts facts that are materially indistinguishable from a relevant Supreme Court precedent' and arrives at [the opposite result]." *Lainfiesta v. Artuz*, 253 F.3d 151, 155 (2d Cir.2001) (*quoting Williams*, 529 U.S. at 405, 120 S.Ct. 1495). The standards set forth by AEDPA apply to all habeas petitions filed after the statute's effective date of April 24, 1996. *Boyette v. Lefevre*, 246 F.3d 76, 88 (2d Cir.2001) (*citing Williams*, 529 U.S. at 402, 120 S.Ct. 1495).

AEDPA also specifies the applicable standard for federal review of state factual findings: a petitioner must demonstrate that a decision was "based on an unreasonable determination of the facts in light of

the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). In habeas proceedings, a "determination of a factual issue made by a state court shall be presumed to be correct." 28 U.S.C. § 2254(e)(1). Additionally, it is the petitioner's burden to rebut the presumption of correctness "by clear and convincing evidence." *Id.*

### B. Procedural Default

██ Federal habeas review of a claim is generally prohibited if the state court rests its judgment on an independent and adequate state ground. *See Lambrix v. Singletary,* 520 U.S. 518, 522–23, 117 S.Ct. 1517, 137 L.Ed.2d 771 (1997); *Coleman v. Thompson,* 501 U.S. 722, 729, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991); *Jones v. Vacco,* 126 F.3d 408, 414 (2d Cir.1997). Procedural default in state court qualifies as an independent and adequate state ground when "the last state court rendering a judgment in the case clearly and expressly states that its judgment rests on a state procedural bar." *Levine v. Comm'r of Corr. Services,* 44 F.3d 121, 126 (2d Cir.1995) (citations and internal quotation omitted). When the last "reasoned" opinion on a claim explicitly imposes the procedural bar, later unexplained orders upholding that opinion or rejecting that same claim are presumed to uphold the bar. *Ylst v. Nunnemaker,* 501 U.S. 797, 803, 111 S.Ct. 2590, 115 L.Ed.2d 706 (1991). Accordingly, a habeas petitioner's forfeiture of his constitutional claims in state court bars him from litigating the merits of those claims in federal habeas proceedings, "absent a showing of cause for the procedural default and prejudice resulting therefrom." *Grey v. Hoke,* 933 F.2d 117, 121 (2d Cir.1991); *see also Wainwright v. Sykes,* 433 U.S. 72, 87–91, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977).

### C. Exhaustion

██ Federal courts may evaluate habeas corpus petitions only if the petitioner has exhausted his state court remedies, *i.e.,* he (1) has "fairly presented" his federal claims to the state's highest court and (2) does not retain any legal right to raise the question presented in the state courts. 28 U.S.C. § 2254(b)(1); *see Picard v. Connor,* 404 U.S. 270, 275, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971); *see Grey v. Hoke,* 933 F.2d 117, 120 (2d Cir.1991). A petitioner may fulfill these requirements by directly appealing or collaterally attacking his conviction in the highest state court on the same factual and legal bases presented in his federal habeas petition. *See Klein v. Harris,* 667 F.2d 274, 282 (2d Cir.1981). Where a habeas petitioner files a motion to vacate the judgment and such relief is denied, the exhaustion requirement is met. *Id.*

### II. Application

I consider first the issue of exhaustion. I then address petitioner's claims, including the question of whether any of the claims has been procedurally defaulted.

### A. Exhaustion

██ Respondent argues that the Court should dismiss Rivera's petition because he failed to exhaust his state court remedies. In particular, respondent notes, Rivera failed to file a post-trial motion in the trial court pursuant to § 440.10 of the New York Criminal Procedure Law raising the question of ineffective assistance of counsel.

I conclude that Rivera has satisfied the exhaustion requirement because he has presented all of the claims he asserts herein in his applications to the state courts. His direct appeal raised only one issue, the question of the jury instruction regarding the unavailable witness, but his coram no-

bis petitions raised all of the other issues he raises herein. The First Department and Court of Appeals rejected all of his claims, without discussion except as to the jury instruction claim. Although it is true that he did not file a motion pursuant to § 440.10, he did raise the issue of the effectiveness of trial counsel in his other applications for review. It is impossible to tell whether the First Department rejected the claims on the merits or whether the court was of the view Rivera should file a § 440.10 motion because it did not explain or discuss its reasoning. Accordingly, I give Rivera the benefit of the doubt and I assume he has exhausted.

### B. *Petitioner's Claims*

Rivera's habeas petition presents three claims: (1) the trial court gave an erroneous jury instruction regarding the hearsay statements of an unavailable witness, (2) appellate counsel was ineffective, and (3) trial counsel was ineffective. As for appellate counsel, who appealed solely on the issue of the jury instruction regarding the unavailable witness, Rivera argues that she was ineffective because she failed to raise three issues: the prosecution's purported failure to produce *Rosario* material; the purportedly non-unanimous jury; and trial counsel's ineffective assistance. As for trial counsel, Rivera claims that he wrongfully failed to challenge the purported lack of a unanimous jury and wrongfully failed to move to suppress the statements made to (and recorded by) Colon, who was acting as an agent of the police.

I address first the jury instruction claim and second the ineffective assistance claims.

### 1. *The Jury Instruction*

Rivera contends that his due process rights were violated when the trial court gave the jury a cautioning instruction with respect to the elevator operator's hearsay identification of a different person as the man he saw fleeing the murder scene. The claim is rejected, for three reasons.

■ First, the claim is procedurally barred because Rivera did not object to the instruction at trial although he had three opportunities to do so: (1) during a colloquy between the parties when the court indicated its intent to provide a "cautionary [jury] instruction," (2) when the court instructed the jury after Detective Geddes testified, and (3) when the court repeated the instruction during its charge-in-chief. (Tr. 1262–96, 1758–59, 2630–31). Under New York law, the failure to object to a jury instruction at trial constitutes a waiver, precluding a petitioner from raising the issue on review. *See* N.Y.Crim. Proc. § 470.05(2) (McKinney 1986); *Taylor v. Harris*, 640 F.2d 1, 2 (2d. Cir.1981). Indeed, the First Department found this claim procedurally barred.

■ Second, even assuming the issue was not procedurally barred, the claim is rejected on the merits. Clearly, Akram's statements were hearsay, and a substantial question existed as to whether the statements should have been received at all. The trial court engaged in a long colloquy with counsel, and defense counsel conceded that the statements were hearsay. (Tr. 1262–96). In the end, the trial court agreed to let the statements in, but only on the condition that he give a "very strong" cautioning instruction. (Tr. 1733–34). The instruction he gave reflected the principles of law that courts consistently apply to out-of-court statements by unavailable witnesses. The hearsay rules guard against possible deficiencies, error, or untrustworthiness inherent in assertions of witnesses who are not available to be tested by cross-examination. The instruction in dispute merely directed the jury to evaluate Akram's statements with caution be-

cause he was not present and was not subject to cross-examination. (Tr. 1758–59, 2630–31). There was no error.

■ Third, even assuming there was error, the error was harmless. *See Henderson v. Kibbe*, 431 U.S. 145, 154, 97 S.Ct. 1730, 52 L.Ed.2d 203 (1977) (habeas petitioner must show that error in jury instruction so infected entire trial as to violate due process); *Lopez v. Scully*, 614 F.Supp. 1135, 1140 (S.D.N.Y.1985). Another witness who independently viewed the same photo array and picked out the same person as did Akram did testify at trial; this evidence did not raise a reasonable doubt for the jury. More significantly, as the First Department found, there was overwhelming evidence of Rivera's guilt—the testimony of Colon, who participated in the murder with Rivera, corroborated by the testimony of other witnesses as well as documents; the recorded statements that Rivera made to Colon; and the full confessions that Rivera gave to the detectives. In addition, the jury was presented with, and properly rejected, Rivera's patently incredible and indeed absurd story that he pretended to admit to the killing to take "the fall" for the murder in return for $250,000. Under all these circumstances, clearly the instruction, even if erroneous, did not infect the entire trial.

This claim is rejected.

### 2. *Ineffective Assistance of Counsel*

Petitioner asserts violations of his Sixth Amendment right to counsel because both trial and appellate counsel purportedly were ineffective. I discuss first the applicable legal standard and then the effectiveness in turn of trial counsel and appellate counsel.

#### a. *Applicable Law*

To prevail on an ineffective assistance of counsel claim, petitioner must satisfy the two-prong test set forth in *Strickland v. washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). First, the petitioner must demonstrate that his "counsel's representation fell below an objective standard of reasonableness." *Id.* at 687–88. Second, he must show that counsel's deficient performance prejudiced his defense. *Id.* at 692, 104 S.Ct. 2052. To demonstrate that he was prejudiced, petitioner must prove that, but for counsel's errors, there is a sufficient probability that the outcome of the proceeding would have been different. *Id.* at 694, 104 S.Ct. 2052. To succeed, petitioner must overcome a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *See id.* at 689, 104 S.Ct. 2052. Furthermore, judicial scrutiny of counsel's performance and trial strategy must be deferential, "evaluat[ing] the conduct from counsel's perspective at the time." *See id.*

■ While the *Strickland* two-pronged test initially applied to trial counsel, it has been extended to appellate attorneys as well. *Mayo v. Henderson*, 13 F.3d 528, 533 (2d Cir.1994). To establish ineffective assistance of appellate counsel, it is not sufficient to demonstrate that counsel omitted a non-frivolous argument, because appellate counsel is not required to raise all possible arguments. *Id.* "[I]ndeed, the weeding out of weaker issues is widely recognized as one of the hallmarks of effective appellate advocacy." *Miller v. Keeney*, 882 F.2d 1428, 1434 (9th Cir.1989) (citations omitted). Failure to raise an argument on appeal constitutes ineffective assistance only when the omitted issue is clearly stronger and more significant than those presented. *See Mayo*, 13 F.3d at 533 (citing *Gray v. Greer*, 800 F.2d 644, 646 (7th Cir.1986)).

■ To establish that a habeas petitioner was prejudiced by appellate coun-

sel's failings under the second prong of the *Strickland* test, the petitioner must establish that there is a reasonable probability that the omitted "claim would have been successful before the [state's highest court]." *See id.* (quoting *Claudio v. Scully,* 982 F.2d 798, 803–05 (2d Cir.1992)).

### b. *Trial Counsel*

Rivera contends that he was denied effective assistance of trial counsel because his attorney failed to raise claims that (a) Rivera was convicted by a non-unanimous jury verdict and (b) Rivera's statements to Colon, who was working under the direction of police, amounted to an inadmissible confession. The claims are rejected. Taken together or individually, the claims do not overcome the strong presumption of trial counsel's reasonable representation. Moreover, Rivera has not demonstrated prejudice because the outcome would not have been different had his counsel raised these claims.

### i. *Non–Unanimous Jury Verdict*

The non-unanimous jury issue is rejected, for two reasons.

■ First, this issue is not reviewable because Rivera's counsel failed to object at the time. A defendant waives any objection to the verdict or the polling procedure if it is not raised before the jury is discharged. *People v. Alfaro,* 66 N.Y.2d 985, 987, 499 N.Y.S.2d 378, 489 N.E.2d 1280 (N.Y.1985). Likewise, a request for correction or clarification of verdict irregularities must be preserved for appellate review by lodging a specific application for relief before the jury is discharged. *People v. Mercado,* 91 N.Y.2d 960, 963, 672 N.Y.S.2d 842, 695 N.E.2d 711 (N.Y.1998). Here, no objection or request for clarifica-

tion was made, and thus this claim is unpreserved for review.

■ Second, even assuming the claim is not barred, it is rejected on the merits because it is frivolous. The record shows clearly that the jury verdict was unanimous. The exact words used by a juror are immaterial if a particular juror's verdict is clear from the record or clear to the trial court. *See United States v. Lawrence,* 618 F.2d 986, 988 (2d Cir.1980) (citing *Jackson v. Howard,* 403 F.Supp. 107, 109 (W.D.Pa.1975) (holding that appellate courts must respect trial court's discretion in accepting jury verdicts because there may be relevant circumstances that do not necessarily appear on a written transcript)); *see also Arizona v. Greer,* 190 Ariz. 378, 948 P.2d 995, 998 (1997) (holding that court reporter's failure to transcribe jurors' individual responses did not affect defendant's right to jury poll).[7] Here, after the verdict and before polling, the Court Clerk asked the foreperson "so say you all?" and she responded "yes." Likewise, at the conclusion of individual polling, the Court Clerk announced "[a]nd so say you all," to which no jury member objected. (Tr. 2677). More, significantly, if any juror had not responded or if any juror had answered in the negative or if the Court Clerk had responded for one of the jurors, someone—a juror, defense counsel, the prosecutor, or the trial judge—surely would have raised the issue. Clearly, the reason defense counsel remained silent is that all 12 jurors answered affirmatively and the errors are merely transcription errors. Inconsequential and non-prejudicial transcription errors do not warrant a new trial. *United States v. DiCanio,* 245 F.2d 713, 715 (2d Cir.1957). Trial counsel

7. Courts have accepted "guilty" verdicts even in instances where jurors express reluctance, unless jurors explicitly reply in the negative when polled. *See e.g., People v. Francois,* 297 A.D.2d 750, 748 N.Y.S.2d 384 (2d Dep't 2002).

did not act ineffectively by failing to raise this issue.

### ii. *The Statements to Colon*

Rivera's claim that his trial counsel was constitutionally ineffective in not moving to suppress the statements he made to Colon also lacks merit.

■ As a threshold matter, Rivera acknowledges that the basis for his argument that the statements should have been suppressed is state rather than federal law. (Traverse at 5–6). Although, as the Second Circuit has held, "[t]he Sixth Amendment bars the government from planting an agent to elicit jailhouse admissions from an indicted defendant who has asserted his right to counsel," *United States v. Birbal*, 113 F.3d 342, 345 (2d Cir.1997), the Sixth Amendment right to counsel "is offense specific." *Hurd v. Stinson*, No. 99 Civ. 2426(LBS), 2000 WL 567014, at *12 n. 12 (S.D.N.Y. May 10, 2000) (quoting *McNeil v. Wisconsin*, 501 U.S. 171, 175, 111 S.Ct. 2204, 115 L.Ed.2d 158 (1991)). Hence, a defendant who is in custody for certain charges does not have a Sixth Amendment right to counsel with respect to unrelated crimes. *See also United States v. Santiago*, 3 F.Supp.2d 392, 395 & n. 4 (S.D.N.Y.1998) (holding that where Sixth Amendment right has attached with respect to a charge offense, it attaches with respect to "closely related" but uncharged crimes as well).

Here, in 1992 and 1993, Rivera had not been charged with the murder of Denoia, and he certainly was in custody in California in connection with wholly unrelated charges. Hence, his federal Sixth Amendment right to counsel had not attached with respect to the Denoia murder.

Rivera's argument, however, is more subtle. He argues that he had certain rights under state law that were violated, and that when his trial counsel in this case failed to move to suppress under state law, his federal right to effective assistance of counsel was violated. (*See* Traverse at 5–6).

■ Rivera is correct that under New York law, once a defendant is represented by counsel on the charge for which he is in custody, " 'custodial interrogation about any subject, whether related or unrelated to the charge upon which representation is sought or obtained, must cease.' " *People v. Burdo*, 91 N.Y.2d 146, 667 N.Y.S.2d 970, 971, 690 N.E.2d 854 (1997) (quoting *People v. Steward*, 88 N.Y.2d 496, 646 N.Y.S.2d 974, 977, 670 N.E.2d 214 (N.Y.1996)); (*see also People v. Rogers*, 48 N.Y.2d 167, 422 N.Y.S.2d 18, 19, 397 N.E.2d 709 (1979)). Hence, "the New York right to counsel is clearly much broader than the federal right to counsel." *Hurd*, 2000 WL 567014, at *12 n. 12.

■ It is undisputed that law enforcement used Colon to elicit incriminating statements from Rivera while Rivera was in custody. (Resp.'s Mem. at 33). Although the record is unclear as to the circumstances of Rivera's incarceration, *i.e.*, whether charges were pending against him or whether he had already been convicted and was serving a sentence or whether he was represented by counsel on the charges for which he was in custody at the time, I assume that Rivera had a right to counsel, at least under state law, when Colon, acting as an agent of law enforcement, spoke to Rivera while he was in custody in 1992 and 1993. Nonetheless, the claim is rejected.

First, in light of Rivera's testimony at trial, it would not have been reasonable for trial counsel to have moved to suppress on the grounds that Colon had acted as an agent for law enforcement to elicit admissions from Rivera unwittingly, in violation of his right to counsel. In fact, Rivera had

told his trial counsel that he knew he was being recorded by Colon and that he was making the incriminating statements to Colon voluntarily and knowingly as part of a scheme to "take the fall" for the murder in return for money. Rivera testified to this scheme under oath, and any motion by defense counsel along the lines that Rivera now suggests would have undermined the defense that Rivera put forth at trial. Under these circumstances, Rivera cannot complain now that his trial counsel failed to take action that would have been at odds with what Rivera presumably told him.

Second, even assuming Rivera's trial counsel had erred in failing to move to suppress on this basis, the evidence of his guilt was overwhelming in any event. Even if Rivera's attorney had succeeded in obtaining suppression of the taped conversations with Colon, the record still contained substantial evidence of Rivera's guilt—including Colon's detailed testimony, corroborated by other witnesses and documentary evidence, and Rivera's written and oral confessions to the detectives.

 Nor can Rivera argue, even assuming his statements were obtained by Colon improperly, that his confessions to the detectives were the "fruit" of the improperly obtained statements, for the confessions were given to the detectives in a Texas prison in April 1994, at least a year after the last of the recorded statements and some 16 months after the third visit by Colon to Rivera in prison in California. Voluntary statements resulting from a police interrogation are admissible against a defendant who has knowingly and voluntarily waived his *Miranda* rights. The effects of any violation of Rivera's rights in 1992 or early 1993 would have dissipated by April 1994, and would have had no effect on the voluntary and knowing nature of Rivera's later confessions. *See*

*Tankleff v. Senkowski*, 135 F.3d 235, 244 (2d Cir.1998) (citing *Oregon v. Elstad*, 470 U.S. 298, 309, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985)). Moreover, Rivera took the stand at trial and testified in substance that his "confessions" were voluntarily and knowingly given, albeit as part of the scheme for him to take the fall for the murder. He cannot be heard to complain now that his confessions were not voluntary and knowing.

Hence, this claim provides no basis for habeas relief.

### c. *Appellate Counsel*

Rivera argues that his appellate counsel was ineffective because she failed to appeal on the issues of (1) the non-unanimous verdict, (2) ineffective assistance of trial counsel, and (3) the prosecution's failure to produce *Rosario* material at trial. As discussed above, Rivera's contentions regarding a non-unanimous verdict and ineffective assistance of trial counsel have no merit. Therefore, I turn to the third issue, appellate counsel's failure to appeal based on the alleged *Rosario* violation. The claim is rejected.

 First, to establish ineffective assistance of appellate counsel, Rivera must demonstrate that the issues omitted by counsel are clearly stronger than those actually presented. *Mayo v. Henderson*, 13 F.3d 528, 533 (2d Cir.1994). In a 32-page brief to the First Department, appellate counsel argued essentially one issue—the jury instruction regarding the unavailable witness. (Resp.Mem., Ex. A). I am not persuaded that appellate counsel was wrong to focus on this issue rather than the others. Indeed, the Second Circuit has held that courts may not " 'second-guess reasonable professional judgments' by appellate attorneys as to what are the most promising issues for appellate review." *Tsirizotakis v. LeFevre*, 736 F.2d

57, 65 (2d Cir.1984) (*quoting Jones v. Barnes,* 463 U.S. 745, 743, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983)).

Second, I believe that appellate counsel correctly decided not to raise the issue on appeal. The detective was unsure as to whether he even made any additional notes. (Tr. 505, 506). Assuming there were additional notes, the records apparently only related to the positioning of a bullet shell at the murder scene. (Tr. 2294, 2298). Trial counsel argued that he would have used this information to question Colon on where the gunman was standing in Denoia's office (Tr. 2298), but this line of questioning would have been a futile attempt at impeaching Colon as a witness because Colon had previously testified that he was waiting in the car when Rivera murdered Denoia. (Tr. 1133).

 Third, even assuming appellate counsel should have raised the *Rosario* argument, there is no prejudice resulting from this omission. When the prosecution fails to produce *Rosario* material due to loss or destruction, the trial court may impose sanctions only when the evidence could have materially altered the verdict. *People v. Wallace,* 76 N.Y.2d 953, 563 N.Y.S.2d 722, 565 N.E.2d 471 (N.Y.1990). The trial court has the discretion to make this determination, based on the cumulative evidence and the missing documents' relative significance. *People v. Haupt,* 71 N.Y.2d 929, 931, 528 N.Y.S.2d 808, 524 N.E.2d 129 (N.Y.1988). Rivera's confession, Colon's incriminating testimony, and the physical evidence presented at trial overwhelmingly proved Rivera's guilt, and the missing notes would have made no difference. Furthermore, the court permitted defense counsel to argue that the jury could draw a negative inference from the possibility that the crime scene report was incomplete, thereby reducing if not eliminating any prejudice from the absence of the notes. (Tr. 2298–99).

Therefore, Rivera fails to show ineffective assistance of appellate counsel in this respect.

### CONCLUSION

For the foregoing reasons, the petition for a writ of habeas corpus is denied. Because Rivera has not made a substantial showing of the denial of a constitutional right, I decline to issue a certificate of appealability. *See* 28 U.S.C. § 2253 (as amended by AEDPA). I certify pursuant to 28 U.S.C. § 1915(a)(3) that any appeal taken from this decision would not be taken in good faith. The Clerk of the Court is directed to enter judgment accordingly and to close this case.

SO ORDERED.